# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| German Leal and Esperanza Pena on behalf of themselves and the Baxter International Inc. & Subsidiaries Incentive Investment Plan, *and all other similarly situated ERISA plan participants and beneficiaries*, | ) ) ) ) ) ) | No. |
| | | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| State Street Bank & Trust Co., State Street Global Advisors, and State Street Global Markets, LLC, | ) ) ) ) | |
| Defendants. | | |

**TABLE OF CONTENTS**

I.    COMPLAINT ................................................................................................ 1

II.   OVERVIEW ................................................................................................. 1

III.  JURISDICTION AND VENUE .................................................................. 5

IV.   THE PARTIES ............................................................................................ 5

      A.    Plaintiffs ........................................................................................... 5

      B.    Defendants ........................................................................................ 6

V.    DEFENDANTS' FIDUCIARY STATUS .................................................... 7

VI.   SUBSTANTIVE ALLEGATIONS ............................................................ 10

VII.  THE RELEVANT LAW ........................................................................... 20

VIII. CLASS ACTION ALLEGATIONS .......................................................... 23

IX.   CLAIMS FOR RELIEF ............................................................................ 27

# I.   COMPLAINT

Plaintiffs German Leal and Esperanza Pena ("Plaintiffs"), bring this class action on behalf of the Baxter International Inc. & Subsidiaries Incentive Investment Plan (the "Plan") and on behalf of all other similarly-situated employee benefit plans subject to the provisions of the Employee Retirement Income and Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001 et seq., that suffered losses as a result of the breaches of fiduciary duties by Defendants State Street Bank & Trust Company ("SSBT"), State Street Global Advisors ("SSGA"), and State Street Global Markets, LLC ("SSGM"), (collectively "Defendants" or "State Street") described herein. Plaintiffs bring this action by and through their undersigned attorneys based upon personal knowledge and information obtained through investigation by their counsel. Plaintiffs expect that reasonable opportunity for discovery will uncover further substantial support for the allegations in this Complaint.

# II.   OVERVIEW

1.     This Complaint concerns ERISA violations that Defendants committed in their roles as fiduciaries including by designation as investment service providers, investment managers, investment custodians, investment trustees and investment record keepers to Plaintiffs and the Plans, and as functional fiduciaries for the Plaintiffs and the Plans. Plaintiffs Leal and Pena are participants and beneficiaries in the Baxter International Inc. & Subsidiaries Incentive Investment Plan, a defined contribution plan.  In violation of their fiduciary duties and ERISA's prohibited transaction rules, Defendants systematically overcharged participants and beneficiaries such as Plaintiffs and the Plans for "expenses" including so-called SWIFT messaging services (hereafter, "Improper Out-of-Pocket Markups").  As a result of this practice, Plaintiffs and the Plans seek to redress losses to the Plans, obtain Plan-wide injunctive relief, and

secure disgorgement of unjust profits, and other appropriate equitable relief pursuant to ERISA §§409 and 502(a)(2) and (3), 29 U.S.C. §§1109 and 1132(a)(2) and (3).

2.     Society for Worldwide Interbank Financial Telecommunication (hereinafter "SWIFT") messages are secure electronic messages used to effectuate securities trades and related financial transactions, including payments.  Defendants systematically overcharged Plaintiffs for transmission of SWIFT messages incident to Plaintiffs' retirement investing through the Plan and did likewise for the Plans.

3.     SWIFT is a messaging network that financial institutions use to transmit information and instructions securely through a standardized system of codes. While SWIFT message-related expenses were labeled as out-of-pocket expenses and charged as such to Defendants' clients (including the Plans), in reality these expenses were marked up by Defendants by a factor of up to 20 times the actual amount of money it cost Defendants to send SWIFT messages on behalf of Plaintiffs and the Plans.  Defendants did this while they were ERISA fiduciaries or service providers to Plaintiffs and the Plans.

4.     What, exactly, is a SWIFT message?  Consider the following example.  Assume a customer of a Bank of America branch in New York wants to send money to his friend who banks at the UniCredit Banca branch in Venice. The New Yorker can walk into his Bank of America branch with his friend's account number and UniCredit Banca's unique SWIFT code for its Venice branch. Bank of America will send a payment transfer SWIFT message to the UniCredit Banca branch over the secure SWIFT network. Once UniCredit Banca receives the SWIFT message about the incoming payment, it will clear and credit the money to the Italian friend's account.  (See http://www.investopedia.com/articles/personal-finance/050515/how-swift-system-works.asp (last viewed March 20, 2017).)

5.     As explained further below, Defendants price-gouged retirement plans and other clients by charging clients Improper Out-of-Pocket Markups far in excess of the actual cost of providing those services.  Defendants did this notwithstanding while they were serving as ERISA fiduciaries to the Plans.  In fact, for almost two decades these mark-ups on SWIFT message expenses were a secret and lucrative profit center for Defendants.  That is, until 2016, when the Secretary for the Commonwealth Massachusetts  Securities Division filed an enforcement complaint against Defendants concerning its Improper Out-of-Pocket Markups.  (See https://www.bostonglobe.com/business/2016/04/20/state-street-hit-galvin-for-overbilling-clients/8j3n0XMwUOLddJQcijtMRK/story.html (last viewed March 20, 2017).)

6.     In December of 2015, State Street announced that it was reviewing its invoicing practices concerning certain expenses invoiced to clients during an 18-year period going back to 1998, including invoices for SWIFT messaging. In its most recent 10K filing, State Street stated that it expects to pay at least $340 million (including interest) to customers whom it charged excessive expenses..

7.     Defendants' imprudent, disloyal, and conflicted decisions resulted in the Plan and the Plans paying excessive charges for the Improper Out-of-Pocket Markups that substantially diminished the retirement savings of participants and beneficiaries.

8.     Defendants' Improper Out-of-Pocket Markups violated provisions of ERISA § 406 that prohibit fiduciaries from causing retirement plans to engage in transactions with related parties and from engaging in self-dealing transactions. By using the Plans' retirement plan assets for the benefit of themselves and their affiliates, and by collecting unreasonable fees and other compensation in connection with Improper Out-of-Pocket Markups and placing their own interests ahead of those of the participants and the Plans, Defendants engaged in multiple

prohibited transactions, which are *per se* unlawful and not exempt under any individual, class, or statutory exemption.

9.      Defendants' Improper Out-of-Pocket Markups violated provisions of ERISA § 406 that prohibit fiduciaries from causing retirement plans to engage in transactions with related parties and from engaging in self-dealing transactions. By using the Plans' retirement plan assets for the benefit of themselves and their affiliates, and by collecting unreasonable fees and other compensation in connection with Improper Out-of-Pocket Markups and placing their own interests ahead of those of the participants and beneficiaries and the Plans, Defendants engaged in multiple prohibited transactions, which are *per se* unlawful and not exempt under any individual, class, or statutory exemption.

10.      Defendants also breached their duties of prudence and loyalty under ERISA § 404(a) by using the Plans' assets imprudently, by acting in their self-interest, by charging excessive fees, and by causing needless losses to the Plans. Defendants also engaged in transactions that are expressly prohibited under ERISA. Despite knowing of the breaches of fiduciary duty and engagement in prohibited transactions, Defendants failed to prevent those ERISA violations in violation of ERISA § 405.

11.      Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf themselves and all other similarly-situated persons who are participants or beneficiaries in ERISA Plans that suffered losses due to Improper Out-of-Pocket Markups by Defendants ("Plans"), and seeking recovery on behalf of those Plans under ERISA's specific remedial provisions.

12.     Defendants have sole possession of the relevant information and documents concerning Plaintiffs' allegations. Following discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint or, if required, seek leave to amend to add additional facts that further support Plaintiffs' claims.

### III.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), codified at 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

14.     This Court has personal jurisdiction over all Defendants because ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States, and the Court therefore has personal jurisdiction over them.

15.     Venue is proper in this district pursuant to ERISA §502(e)(2), codified at 29 U.S.C. §1132(e)(2), because SSBT, SSGA, and SSGM are headquartered in this District, or have a substantial operational presence in this District.

### IV.     THE PARTIES

**A.     Plaintiffs**

16.     **German Leal ("Leal")** is a participant and beneficiary in the Baxter International Inc. & Subsidiaries Incentive Investment Plan.  Leal resides in Palmetto Bay, Florida.  Leal has directed the investment of plan assets in Leal's account into a number of investment options offered by the Baxter Plan, including the Target Retirement 2045, the Target Retirement 2050, the S&P 500 Equity Index Fund, the Emerging Markets Equity Fund, and the Mid Cap Equity Index Fund, funds that, upon information and belief, were subject to the excessive charges

imposed by Defendants for the Improper Out-of-Pocket Markups. The Plan currently has over 13,000 active participants and about $2,149,700,000 in plan assets.

17.     **Esperanza Pena ("Pena")** is a participant and beneficiary in the Baxter International Inc. & Subsidiaries Incentive Investment Plan.  Pena resides in Chicago, Illinois. Pena also has directed the investment of plan assets in Pena's account into a number of investment options offered by the Baxter Plan, including the Stable Income Fund, the Mid Cap Equity Index Fund, the S&P 500 Equity Index Fund, the International EAFE Equity Index Fund, the Small Cap Fund, the Target Retirement 2030 Fund, the Baxter Common Stock Fund, the Baxalta Common Stock Fund, the General Equity Fund, and the Composite Fund, funds that, upon information and belief, were subject to the excessive charges imposed by Defendants through the Improper Out-of-Pocket Markups.

**B.      Defendants**

18.     **State Street Bank & Trust Company ("SSBT")**. According to the Plan's 2015 United States Department of Labor ("DOL") Form 5500 filings, SSBT serves as the Trustee for the Plan.  Additionally, SSBT performs and has received fees for other services it provides for the Plan – including custodial services and investment management.  As Trustee, SSBT is, by definition, a fiduciary to the Plan.

19.     SSBT is located in Quincy, Massachusetts.  Further, as reported on Form 5500 filings for the collective funds (also commonly referred to as collective investment trusts) that are offered as investment alternatives in the Plan, SSBT also serves as the trustee and investment manager for the State Street Global Advisors Daily EAFE Fund, the State Street Global Advisors Emerging Markets Fund, and the State Street International Index Non-Lending Series Fund, which are or have been designated investment alternatives for the Plan, as well as numerous

other State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (the "SSGA Accounts").

20.     **State Street Global Advisors ("SSGA")** is an asset manager. SSGA's principal office is located in Boston, Massachusetts. SSGA is the investment manager for the collective funds that State Street offers the Plan, and as such, is a fiduciary to the Plan.

21.     **State Street Global Markets, LLC ("SSGM")**.  SSGM is a limited liability company registered in Delaware and a corporate affiliate and business unit of SSBT.  According to the Financial Industry Regulatory Authority's Central Registration Depository, SSGM maintains a principal place of business located in Boston, Massachusetts.  SSGM has been registered as a broker-dealer in Massachusetts since June 11, 1992.

## V.     DEFENDANTS' FIDUCIARY STATUS

22.     ERISA imposes fiduciary duties on persons explicitly named as fiduciaries. ERISA §402(a), 29 U.S.C. §1102(a).  Such persons can be "named" by the function they serve, *id.*, such as "any administrator, officer, trustee, or custodian." ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and "investment manager[s]," ERISA § 3(38), 29 U.S.C. § 1002.

23.      ERISA also imposes fiduciary duties on any other persons who in fact perform fiduciary functions—these are referred to as "functional fiduciaries." Thus, a person is a fiduciary *to the extent* "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i).

24.     Defendant SSBT is a named fiduciary for Plaintiffs and the Plans. SSBT has served as the Trustee for Plaintiffs and the Plans during all or part of the Class Period. *See* https://www.sec.gov/Archives/edgar/data/10456/000119312516634753/d201282d11k.htm (last viewed March 21, 2017) (SSBT is "the Plan Custodian" for the Plan and also "serves as the trustee" for the Plan; stating also that "trustee fees are paid by the Plan" and that "[e]ach [Plan] participant's account is . . . charged with his or her withdrawals and an allocation of Plan-related expenses").

25.     SSBT also serves as the trustee and investment manager for the SSGA Accounts offered to and held by participants in the Plans, including Plaintiffs. *See* Participation Agreement Section 2(a). "State Street hereby acknowledges that in its capacity as Trustee and Investment Manager it (i) is a 'fiduciary,' as defined in Section 3(21)(A) of ERISA, of the Qualified Investor with respect to the SSgA Account . . . ." Plaintiffs and the Plans that invest in State Street's collective funds are deemed to own an undivided interest in all of the assets of those funds, so the Trustee (SSBT) and Investment Managers (SSBT and/or SSGA) of those collective funds have and exercise discretionary authority and control over assets of the Plans and owe Plaintiffs and the Plans the appropriate fiduciary duties.

26.     On information and belief, SSBT also has served as custodian for Plaintiffs and the Plans during at least part of the Class Period.

27.     In its role as trustee for Plaintiffs and the Plans, SSBT followed directions from SSGM and/or SSGM-affiliated companies and/or agents to assess Improper Out-of-Pocket Markups to Plaintiffs and the Plans, which SSBT knew or should have known was contrary to ERISA and possibly other laws as well.

28.     SSBT, through its SSGA division, exercised authority and control with respect to the management or disposition of the Plans' assets. Accordingly, SSBT was a fiduciary of each and every ERISA Plan which invested in the SSGA Accounts, including those in which Plaintiffs and the Plans have an ownership interest.

29.     SSBT, through its SSGM division, also functioned as a fiduciary to Plaintiffs and the Plans by acting as trustee and custodian for the collective funds, and by exercising authority and control over the Plans' assets when undertaking Improper Out-of-Pocket Markups for those funds.

30.     Defendant SSGA is a named fiduciary for Plaintiffs and the Plans. SSGA has served as an Investment Advisor for certain assets of Plaintiffs and the Plans during all or part of the Class Period. As such, it is a named fiduciary as to those assets of the Plaintiffs and the Plans. Upon information and belief, in its role as Investment Advisor for certain assets of Plaintiffs and the Plans, SSGA received information that SSGM was imposing Improper Out-of-Pocket Markups on those assets of the Plans, which SSGA knew or should have known was contrary to ERISA and possibly other laws as well.

31.     Defendant SSGM is a functional fiduciary for Plaintiffs and the Plans because it exercised authority or control respecting management or disposition of the assets of the Plans and it used that discretion to determine its own compensation in the form of Improper Out-of-Pocket Markups. As explained in further detail below, SSGM was allowed to incur certain necessary expenses for Plaintiffs and the Plans and to pass those expenses along to Plaintiffs and the Plans, but instead of passing along the expenses at cost SSGM marked up those so-called expense items and transformed them into an illicit multi-million-dollar profit center. SSGM unilaterally (or in concert with SSBT and/or SSGA) set its compensation for these pass-through

charges from zero (pass through at cost) to a huge profit margin of, for example, up to $4.74 per SWIFT message. When a party has discretion to determine what ERISA participants and Plans pay it, the party setting its own compensation becomes a functional fiduciary as to the exercise of that discretion. *See Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 304-5 (D. Mass. 2013).

32.     SSGM's Improper Out-of-Pocket Markups constituted the exercise of authority or control respecting the management or disposition of the underlying assets of Plaintiffs' and the Plans' assets within the meaning of ERISA section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and 29 C.F.R. § 2510.3-101(a). This is particularly so because SSGM exercised discretion in choosing when and how to execute the Markups, how much the Markups would be, and then profited and engaged in self-dealing by pocketing the Improper Out-of-Pocket Markups for itself.

## VI.     SUBSTANTIVE ALLEGATIONS

33.     As detailed in an April 20, 2016, Administrative Complaint filed by the Secretary of the Commonwealth of Massachusetts ("Secretary") against SSGM (the "Administrative Complaint"), over an 18-year period, Defendants, through concealed markups on out-of-pocket expenses disguised as "pass through charges," earned hundreds of millions of dollars in additional revenue at the expense of investors such as the Plans and Plaintiffs here.

34.     Although Defendants have recently publically disclosed the existence of certain "incorrect invoicing" to their clients, Defendants' emails, along with information obtained by the Secretary  in connection with the aforementioned Administrative Complaint, demonstrate a dishonest and pervasive culture of overbilling by Defendants.

35.     Defendant SSGM charged out-of-pocket expenses to their custodial clients, which included pension fund, mutual fund, hedge fund, and institutional investors (including but not

limited to Plaintiffs and the Plans).  Out-of-pocket expenses included, but were not limited to courier services, stamp duties, telex, expenses related to wires and SWIFT messages.

36.     While labeled as an out-of-pocket expense by Defendants, SWIFT message fees contained concealed markups that were as much as 20 times the actual cost.  As a result, SWIFT message fees were not merely out-of-pocket costs passed along to Plaintiffs and Plan participants as expenses or pass through charges (i.e., actual cost without an added profit markup), rather, the SWIFT messaging charges became a profit center for Defendants.

37.     Defendants' SWIFT message expenses included two components: (1) unit charges and (2) Defendants' SWIFT message fee ("SWIFT message fee").

38.     The unit charge represented the per SWIFT message expense charged by SWIFT to Defendants.

39.     The standard SWIFT message fee of $5.00 purportedly included Defendants' overhead expense associated with sending SWIFT messages. For example, the cost of SWIFT terminals, maintenance of files to SWIFT and all other overhead costs incurred by Defendants to ensure proper transmission of the SWIFT messages.

40.     While the unit charge associated with SWIFT messaging decreased over time, the standard SWIFT message fee charged by Defendants remained $5.00.

41.     Defendants have long known that the SWIFT message fees being charged to their clients were disproportionate to the actual costs for these services and Defendants' billing practices were part and parcel of an intention by Defendants to make outsize profits on out of pocket and fee-based services offered to clients.

42.     On July 29, 2002, a consulting firm presented findings to Defendants including a report titled "Capturing Value From Billed-Versus-Contracted Discrepancies" (hereinafter "Fee Report").

43.     The Fee Report identified an opportunity for Defendants to recover a total of $9-13 million revenue related to so-called Out-of-Pocket and fee-based expenses by "more aggressive data capture and billing practices."

44.     On information and belief, and as set forth in the Administrative Complaint, discovery will reveal Defendants' long-running knowledge of the price-gouging scheme related to Improper Out-of-Pocket Markups on SWIFT messages.

45.     As early as 2004, one of Defendants' employees indicated the overhead expense associated with sending SWIFT messages was only $2.00 rather than the standard SWIFT message fee of $5.00.

46.     By 2009, Defendants' employee emails suggested the true cost to Defendants was actually $0.25, reflecting a drastic reduction in the overhead expense associated with sending SWIFT messages.  Despite internal knowledge concerning Defendants' decreased overhead, Defendants continued to bill client funds and accounts, including the Plans, and thereby Plaintiffs and other participants and beneficiaries in the Plans, a $5.00 SWIFT message fee, which Defendants conveyed as a "pass through charge."

47.     Beginning in at least 2004 and continuing through 2015, Defendants' employees recognized that the SWIFT message fee was not merely a "pass through charge" and that it exposed Defendants to liability due to the excessive nature of the charges .

48.     In a November 1, 2004, email, Defendants' employees internally discussed the SWIFT message fee via email, with one of Defendants' employees, stating that "[f]or those clients that are billing back to their client, most clients are billing $5 per message.  The true cost is about $2 per message."

49.     On December 12, 2005, in an email response with the subject line "[REDACTED] SWIFT Recovery" a State Street employee wrote:

> Really I think the only true decision to be made is whether or not we are going to charge the standard ("grossed up") charge or a modified one. The client I had referenced in our phone conversation was . . . already at a non-standard charge of $3.50 as opposed to the standard charge of $5. There is some analysis currently going on around this and I have been told unofficially that the true "cost" is around $1.

50.     On December 14, 2005, Defendants' employees questioned whether the SWIFT message fee being charged was actually "out-of-pocket," when they wrote,

> "[h]ow do we get our arms around what is a realistic number.  If it's costing us $1 and we are charging $5 my concern is that is no longer an out-of-pocket."

51.     Defendants' employees  recognized the tremendous financial exposure and reputational risk created by Defendants' concealed out-of-pocket expense markups.  One of Defendants' employees noted in an email sent on October 24, 2006, that "[t]his could be another 'repo' type issue where if the client ever asked for the detail of the charges we could have egg on our face."

52.     When discussing one large institutional client, one of Defendants' employees stated, "[w]e can't be in a position […] that they discover that we are taking them to the cleaners on SWIFT charges."

53.     In 2007, one of Defendants' employees commented:

Sometime back at the beginning of time there was some form of analysis that
arrived at the $5 per message (my guess / understanding is that there was
overhead included in this figure at the time that now should be spread over a
much larger universe). Today that figure is grossly inaccurate in terms of actual
cost or even any legitimately defendable 'fully loaded cost'.  I would absolutely
not charge this rate to any new clients.

54.     In March 2009, Defendants' employees once again questioned the reasonableness

of Defendants' SWIFT message fee via email, with another of Defendants' employees stating "I

believe we are charging some absurd fee per message (about $5)."

55.     And yet another of Defendants' employees reiterated this sentiment in an email

two days later, stating, "The $5 SWIFT message fee is billed as an out of pocket which by

definition should be a pass through charge at cost."

56.     On April 1, 2009, when discussing the true cost of SWIFT messaging assessed by

Defendants, one of Defendants' employees stated, "I think it is 25 cents to be honest with you."

57.     On April 2, 2009, one of Defendants' employees stated that the SWIFT message

fee was a big problem for Defendants.  According to the email: "Out of pocket" with "mark up"

= Big Problem."

58.     The same day, Defendants' employees further emailed:

The fact [REDACTED] can't provide us what we pay SWIFT per message means
there is some serious monkey business going on here.  It will be interesting to see
what he comes back with. I was told by [REDACTED] what we bill = Per
message fee paid to SWIFT + overhead + programming fees. That is a bunch [of]
crap.

59.     In a separate email exchange on April 6, 2009, yet another of Defendants'

employees also questioned Defendants' SWIFT message fee. When asked whether a senior

employee of Defendants thought that Defendants were charging too much in relation to SWIFT

messages, the senior Defendants' employee responded:

> No issues from me. As far as I am concerned it's been $5.00 for many years on
> many clients and I have no intention to change it. I believe that Managers need an
> education on out of pockets as many of them do not understand how the bank
> arrives at some of the numbers here.  They should be straight pass thru but as well
> [sic] all know this place does tack on additional expenses and marks them up to
> cover all internal costs.

60.     On April 12, 2009, one of Defendants' employees requested information

regarding the SWIFT message fee, to present to one of Defendants' executives, stating, "I want

to lay this out to [Defendants' executive], this is some big $."

61.     On April 13, 2009, another of Defendants' employees responded, summarizing:

> 1. The fee we pay SWIFT is .12 per SMAC unit message and .05 per MCH unit
> message. There is an initiative underway to move these fees to .09 and .04 for
> SMAC and MCH respectively.
>
> 2. The $5 fee represents coverage of the indirect charges for SWIFT messages.
> This includes the cost of SWIFT terminals, maintenance of files to SWIFT and all
> other overhead costs incurred in State Street to ensure proper transmission of the
> SWIFT messages. According to research undertaken by [REDACTED] over the
> past week he estimates the true cost of these indirect charges as about .25. A
> $4.50 markup per message results.
>
> 3. [REDACTED] stated he knows exactly the revenue generated from these SWIFT
> message fees across [REDACTED]'s area. However, he would not disclose this figure to
> me other [sic] to say it is significant. He said that if you or [REDACTED] want this detail
> he would be willing to share. Just from what we have seen in our group the annual
> revenue from this markup must be in the tens $ of millions.

62.     Later, in 2009, another of Defendants' employees emailed, stating, "[t]his is

getting messy.  We are charging the fund a huge mark-up to send SWIFT messages to a service

provider who will know exactly what the messages cost."

63.     Also in 2009, when asked by one of Defendants' employees what to tell a client regarding SWIFT messages, another of Defendants' employees responded, "keep information sharing at a minimum on this."

64.     Again, in 2009, one of Defendants' employees commented, "[w]hy we are marking up SWIFT charges is beyond me.  I understand OOP's [out-of-pockets] as pass through charges."  Only hours later, that same employee emailed, "I'm telling you. I learn something every day. Simply not amazed at anything that goes on here anymore."

65.     While the true cost for SWIFT messages decreased from 2005 to 2009, the standard SWIFT message fee passed through to Defendants' clients, including the Plans, remained consistent.

66.     Approximately one year later, in February 2010, when asked via email about seeking the SWIFT message fees generated from the liquidation of a client fund, one of Defendants' employees stated that "[t]here is a huge markup with SWIFT charges and I don't want her asking for detail and then the secret will be out there."

67.     In an email on July 15, 2010, one of Defendants' employees summarized, "[REDACTED] does not want to pay the $5 per message.  He thinks that is a huge injustice because he knows how little the message costs."

68.     In November 2010, while one of Defendants' employees stated the $5.00 SWIFT message fee covered State Street's overhead, another of Defendants' employees with knowledge of the actual cost of a SWIFT message, incredulously responded in an email, "$4.96 to cover [overhead]? Is she serious??!!"

69.     Further, certain of Defendants' executives knew of Defendants' mark-ups on out-of-pocket expenses.  According to an internal document sent via email to an executive, one of

Defendants' employees stated, "I would think that our clients would think that OOP expenses are pass thru's with maybe a bit of mark-up to cover our expenses. […] We charge our clients $5.00 per message—an exorbitant markup that will certainly piss off clients when they figure this out."

70.     In an email response regarding the document, the same executive stated, "I would delete the section on OOP expenses.  I would do more work on your own and maybe raise as a strategy question with a small group verbally only."

71.     One of Defendants' clients, a boutique investment manager, questioned the amount billed  byDefendants regarding out-of-pocket expenses and SWIFT message charges, beginning in 2010.  Defendants' only response was that out-of-pocket expenses were "pass through charges."

72.     In 2014, the investment manager again raised the identical concern to Defendants regarding high out-of-pocket expenses, noting an unexpected and substantial charge for SWIFT messages.  Finally, in 2015, while meeting with other custodial firms, the investment manager learned that at least one other custodial firm charged at most, $0.25 for SWIFT messages.  For at least some of the investment manager's funds, out-of-pocket expenses were borne by investors. Defendants advised that they would look into the issue, and ultimately agreed to reimburse the investment manager for the overcharged SWIFT message fees dating back to 2009.

73.     On December 17, 2015, Defendants announced in a press release titled "State Street Notifies Asset Servicing Clients about Billing Review" (the "December 17th Press Release"), "that it [was] informing clients about a review that it initiated into the manner in which it invoiced certain expenses to asset servicing clients."

74.     The December 17th Press Release further stated, "[b]ased upon the Company's preliminary assessment, over the 18-year period for which it has accessible records, approximately $200 million or more of expenses may have been incorrectly invoiced."

75.     According to information provided to the Secretary  by Defendants, expenses related to SWIFT messages represented about one half of the total expenses under review by Defendants.

76.     Most recently, Defendants' 2016 annual report published on February 16, 2017, states that Defendants have identified approximately $340 million (including interest) as the amount "we currently expect to pay… in connection with that [invoicing] review."

77.     Although Defendants represent that "expenses" were simply incorrectly invoiced in the December 17th Press Release, over the past 18 years, Defendants overcharged clients using concealed markups as high as 1,900% on Improper Out-of-Pocket Markups like SWIFT messages in derogation of their fiduciary duties. This was of a piece with Defendants' culture of secrecy, which has generated enforcement proceedings abroad as well as in Massachusetts.

78.     These enforcement proceedings include a January 30, 2014, settlement by the Financial Conduct Authority of the United Kingdom with Defendants, which levied a fine of £22,885,000, for "develop[ing] and execut[ing] a deliberate and targeted strategy to charge substantial mark-ups on certain transactions . . .  that were deliberately not agreed [upon] with clients or disclosed to them."

79.     The UK also then stated that "State Street . . . failed to treat its customers fairly by allowing a culture to develop in the UK TM [transition management] business which prioritized revenue generation over the interests of customers."

80. In a related matter, on April 5, 2016, the United States Department of Justice indicted two employees of Defendants for securities fraud and wire fraud, among other charges, for their roles in adding secret commissions to fixed income and equity trades performed within Defendants' transition management business.

81. Despite Defendants' clients, including the funds, paying Improper Out-of-Pocket Markups as high as 1,900%, Defendants internally paid actual costs associated with SWIFT messages.

82. On top of that, Defendants received rebates from SWIFT, which operated as a not-for-profit entity and rebated excess revenues to participating organizations, further offsetting Defendants' SWIFT message overhead costs. Defendants did not share these rebates with the Plans.

83. According to a 2012 email, Defendants received a rebate of approximately $1.5 million from SWIFT.

84. Defendants thus engaged in a long-running course of concealment from Plaintiffs and the Plans of the Improper Out-of-Pocket Markups, and statutes of limitation otherwise applicable should be tolled accordingly.

## VII.    THE RELEVANT LAW

85.    ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), provides, in relevant part, that a civil

action for breach of fiduciary duty may be brought by a participant or beneficiary of a plan for

relief under ERISA §409, 29 U.S.C. §1109.

86.    ERISA §409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

87.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), authorizes participants, beneficiaries,

or fiduciaries of ERISA plan to seek appropriate equitable relief from Defendants, including,

without limitation, injunctive relief, surcharge, a constructive trust, and restitution.

88.    ERISA §§404(a)(1)(A) and (B), 29 U.S.C. §§1104(a)(1)(A) and (B), provide in

relevant part, that a fiduciary shall discharge its duties with respect to a plan solely in the interest

of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

89.    These fiduciary duties under ERISA §§404(a)(1)(A) and (B) are referred to as the

duties of loyalty and prudence and are the "highest known to the law." *Donovan v. Bierwirth*,

680 F.2d 263, 272 n.2 (2d Cir. 1982).

90.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> "Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries [when] deciding … which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable . . . ."  DOL Ad. Op. 97-15A; DOL Ad. Op. 97-16A.

91.     As set forth herein, Defendants failed in the discharge of these duties, and, generally, in their duty to manage the assets of the Plans prudently, loyally, and in the best interests of the Plans and the Class.

92.     ERISA § 406 also prohibits certain transactions with a plan involving parties in interest and fiduciaries because of their high potential for abuse. Essentially, Sections 406(a)(1)(C) and (D) of ERISA prohibit a fiduciary with respect to a plan from causing the plan to engage in a transaction, if he or she knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest, or transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. Section 406(b)(1) of ERISA further prohibits a fiduciary with respect to a plan from dealing with the assets of the plan in his or her own interest of for his or her own account.  In this case, SSBT used its discretionary authority as a fiduciary to execute transactions for the SSGA Accounts through SSGM, its affiliated broker; a transaction that violates ERISA Sections 406(a)(1)(C) and (D) and 406(b)(1).

93.     Section 408(b)(2) of ERISA exempts from the prohibitions of section 406(a) any contract or reasonable arrangement with a party in interest such as SSGM, including a fiduciary, for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.  Further, Section

408(c)(2) of ERISA provides, in relevant part, that nothing in section 406 shall be construed to prohibit any fiduciary from receiving compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his or her duties with respect to the plan.

94.     Marking up expenses charged to the Plans for SWIFT messaging by any amount, but especially by a 1900% profit, to customers for which SSBT owes an undivided duty of loyalty, is prohibited by ERISA and constitutes excessive and unreasonable compensation and makes the exemption provided by ERISA section 408(b)(2) unavailable to Defendants.

95.     Regardless of the availability of the ERISA Section 408(b)(2) exemption, regulation 29 C.F.R. § 2550.408b-2(a) states that section 408(b)(2) of ERISA does not contain an exemption for the prohibitions against self-dealing described in section 406(b) even if such act occurs in connection with a provision of services which is exempt under section 408(b)(2). As explained in 29 C.F.R. 2550.408b-2(e)(1), if a fiduciary uses the authority, control or responsibility which makes him or her a fiduciary to cause the plan to enter into a transaction involving the provision of services when such fiduciary has an interest in the transaction which may affect the exercise of his or her best judgement as a fiduciary, a transaction described in section 406(b) of ERISA would occur, and the transaction would be deemed to be a separate transaction from the one involving the provision of services and would not be exempted by section 408(b)(2).

96.     SSBT has attempted to circumvent the self-dealing prohibitions of ERISA Section 406 by providing in the Participation Agreement that a plan fiduciary that is independent of SSBT must approve the use by SSBT of its affiliated broker, in conformance with the conditions of Prohibited Transaction Class Exemption 86-128 ("PTE 86-128").  Such approval, however, is

expressly subject to SSBT's obligation to obtain "best execution" for securities trades which, on

its face, could not conceivably include an expense mark-up of 1900%.  Furthermore, PTE 86-128

provides that an entity serving as the plan trustee, as SSBT does for the Plan, may execute or

effect securities transactions for a plan only if he or she credits all profits earned in connection

with the transaction to the plan, which in this case would include, among other profits, the up to

1900% profit earned on SWIFT message fees.

97.     Notwithstanding the foregoing allegations that various prohibited transaction

exemptions are not available to Defendants, a claim that an alleged prohibited transaction is

subject to an exemption is an affirmative defense as to which the defendant bears the burden of

proof.[1]

## VIII.   CLASS ACTION ALLEGATIONS

98.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules

23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on

behalf of the Plans and the following class of persons similarly situated (the "Class"):

> Participants and beneficiaries of ERISA Plans that were charged Improper Out-of-
> Pocket Markups by the Defendants, between January 1, 1998 and the present (the
> "Class Period").

99.     **Numerosity**. The members of the Class are so numerous that joinder of all

members is impracticable. While the exact number of Class members is unknown to Plaintiffs at

this time, and can only be ascertained through appropriate discovery, upon information and

belief, hundreds of ERISA-covered retirement plans throughout the country invested their

participants' retirement savings with Defendants and used Defendants as investment service

providers, investment managers, investment custodians, investment trustees and/or investment

---

[1] *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

record keepers as Plaintiffs and the Plan did here during the Class Period, and sustained losses as a result of Defendants' Improper Out-of-Pocket Markups. For example, a past Schedule D to the DOL Form 5500 for Defendants' "EAFE Index Non-Lending Fund" offered by the Plan lists forty-seven other ERISA-covered plans as investors in the fund. And this fund is but one of a number of investment funds offered to the Plans and handled by Defendants and whose activities were occasion for Defendants to gouge the Plans with Improper Out-of-Pocket Markups.

100.    **Commonality**. The claims of Plaintiffs and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by the Defendants. Proceeding as a class action is particularly appropriate here, because Plan assets are held in collective funds or investment trusts managed by Defendants, where each of the Plans' investors shares in gains and losses on a pro rata basis. Defendants' improper actions, then, affected all Plans in the same manner.

101.    Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

(a)    Whether Defendants are fiduciaries under ERISA;

(b)    Whether Defendants breached their fiduciary duties under ERISA;

(c)    Whether any Defendant who was not a fiduciary was a party in interest under ERISA;

(d)    Whether any Defendant who was neither a fiduciary or party in interest under ERISA was a knowing participant in a breach of fiduciary duty by another Defendant;

(e)     Whether Defendants failed to provide complete and accurate information to Plans and their participants and beneficiaries when Defendants imposed Improper Out-of-Pocket Markups;

(f)     Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class, are entitled;

(g)     Whether Defendants received Improper Out-of-Pocket Markups, direct or indirect, in connection with transactions involving Plan assets, and whether such compensation was reasonable;

(h)     Whether Defendants breached their duties in charging Improper Out-of-Pocket Markups;

(i)     Whether Defendants caused the Plans to engage in prohibited transactions with parties in interest and fiduciaries, including Defendants and their affiliates; and

(j)     Whether an affirmative defense to ERISA prohibited transactions applies here and can be satisfied by Defendants.

102.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs seek relief on behalf of the Plans pursuant to ERISA §502(a)(2), and, thus, Plaintiffs' claims on behalf of the Plans are not only typical of, but identical to, a claim under this section brought by any Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

103.   **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

104.   **Rule 23(b)(1)(A) &(B) Requirements**. Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

105.   **Rule 23(b)(2) Requirements**. Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

106.   **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE:
### SSGM'S VIOLATION OF ERISA § 406(a)

107.   Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

108.   Defendant SSGM is a functional fiduciary for Plaintiffs and the Plans.  As such, it is prohibited from engaging in conduct proscribed by ERISA § 406(a), 29 U.S.C. § 1106(a).

109.   SSGM violated ERISA § 406(a)(1)(C) by causing the Plans to incur Improper Out-of-Pocket Markups that constitutes direct or indirect furnishing of goods, services, or facilities between the Plans and one or more parties in interest including SSGM, SSBT and/or SSGA.

110.   SSGM violated ERISA § 406(a)(1)(D) by causing the Plans to incur Improper Out-of-Pocket Markups that constitutes direct or indirect transfer to, or use by or for the benefit of a party in interest including SSGM, SSBT and/or SSGA, of any assets of the Plans, including but not limited to rebates from SWIFT that SSGM withheld from Plaintiffs and the Plans.

111.   SSGM knew or should have known that it was causing the Plans to engage in the transactions discussed above.

112.   As a consequence of these ERISA violations, the Plans suffered financial losses.

113.   To remedy these violations, Plaintiffs are entitled to appropriate equitable relief under ERISA §502(a)(3).

## COUNT TWO:
## SSGM'S VIOLATION OF ERISA § 406(b)

114.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

115.     Defendant SSGM is a functional fiduciary for Plaintiffs and the Plans. As such, it is prohibited from engaging in conduct proscribed by ERISA § 406(b), 29 U.S.C. § 1106(b).

116.     SSGM violated ERISA § 406(b)(1) by dealing with the assets of the Plans in its own interest or for its own account.

117.     SSGM violated ERISA § 406(b)(1) by receiving consideration for its own account from any party dealing with the Plans in connection with transactions involving the assets of the Plans, including but not limited to rebates from SWIFT that SSGM withheld from Plaintiffs and the Plans.

118.     As a consequence of these ERISA violations, the Plans suffered financial losses.

119.     To remedy these violations, Plaintiffs are entitled to appropriate equitable relief under ERISA §502(a)(3).

## COUNT THREE:
## SSGM'S VIOLATION OF ERISA § 404(a)

120.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

121.     Defendant SSGM is a functional fiduciary for Plaintiffs and the Plans.  As such, ERISA § 404 requires SSGM to discharge its fiduciary duties solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. ERISA §

404, 29 U.S.C. § 1104, also requires SSGM to discharge its fiduciary duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

122.   SSGM breached these duties by causing the Plans to incur Improper Out-of-Pocket Markups, which was not solely in the interest of the Plans' participants and beneficiaries, not for the exclusive purpose of providing benefits to Plans' participants and their beneficiaries, and certainly not for the purpose of defraying reasonable expenses of administering the plan. SSGM's conduct also breached its duties of care, skill, prudence and diligence.

123.   As a consequence of these ERISA violations, the Plans suffered financial losses.

124.   To remedy these violations, Plaintiffs are entitled under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to damages in an amount sufficient to make good to the Plans any losses to the Plans resulting from each such breach, and to restore to the Plans any profits of SSGM which have been made through use of assets of the Plans by SSGM. Plaintiffs are also entitled to such other equitable or remedial relief as the court may deem appropriate.

## COUNT FOUR:
## SSBT'S VIOLATION OF ERISA § 405(a)

125.   Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

126.   Defendant SSBT is a named fiduciary for the Plans. It is the Trustee for the Plans, which is a fiduciary role. As a fiduciary for the Plans, SSBT is liable pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a), for SSGM's breaches of fiduciary duty set forth in Counts I-III above to the extent: (1) it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by breach

of its own fiduciary duties it has enabled SSGM to commit a breach of its duties; or (3) if it has knowledge of a breach by SSGM, unless it makes reasonable efforts under the circumstances to remedy SSGM's breach.

127.    SSBT participated knowingly in, or knowingly undertook to conceal, SSGM's violations of ERISA set forth in this Complaint knowing that such act or omission is a breach.

128.    SSBT breached its own fiduciary duties as Trustee and thereby enabled SSGM to commit a breach of its duties.

129.    SSBT has knowledge of breaches of duty by SSGM and did not take reasonable efforts to remedy those breaches.

130.    As a consequence of these ERISA violations, the Plans suffered financial losses.

131.    To remedy these violations, SSBT and SSGM should be held jointly and severally liable to Plaintiffs and the Plans.

**COUNT FIVE:**
**SSGA'S VIOLATION OF ERISA § 405(a)**

132.    Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.    Defendant SSGA is a named fiduciary for the Plans. It is an Investment Advisor for the Plans, which is a fiduciary role. As a fiduciary for the Plans, SSGA is liable pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a), for SSGM's breaches of fiduciary duty set forth in Counts I-III above to the extent: (1) it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by breach of its own fiduciary duties it has enabled SSGM to commit a breach of its duties; or (3) if it has knowledge of a breach by SSGM, unless it makes reasonable efforts under the circumstances to remedy SSGM's breach.

134.     SSGA participated knowingly in, or knowingly undertook to conceal, SSGM's violations of ERISA set forth in this Complaint knowing that such act or omission is a breach.

135.     SSGA breached its own fiduciary duties as Investment Advisor and thereby enabled SSGM to commit a breach of its duties.

136.     SSGA has knowledge of breaches of duty by SSGM and did not take reasonable efforts to remedy those breaches.

137.     As a consequence of these ERISA violations, the Plans suffered financial losses.

138.     To remedy these violations, SSGA and SSGM should be held jointly and severally liable to Plaintiffs and the Plans.


**COUNT SIX:**
**SSGM'S VIOLATION OF ERISA § 405(a)**

139.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

140.     Defendant SSGM is a functional fiduciary for Plaintiffs and the Plans.  As such, ERISA § 404 requires SSGM to discharge its fiduciary duties solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. ERISA § 404, 29 U.S.C. § 1104, also requires SSGM to discharge its fiduciary duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

141.    SSGM participated knowingly in, or knowingly undertook to conceal, SSBT's and/or SSGA's violations of ERISA set forth in this Complaint knowing that such acts or omissions is a breach.

142.    SSGM breached its own fiduciary duties and thereby enabled SSBT and/or SSGA to commit a breach of their duties.

143.    SSGM has knowledge of breaches of duty by SSBT and/or SSGA and did not take reasonable efforts to remedy those breaches.

144.    As a consequence of these ERISA violations, the Plans suffered financial losses. To remedy these violations, SSGM should be held jointly and severally liable with SSGA and SSGM to Plaintiffs and the Plans.

## COUNT SEVEN:
## SSBT's VIOLATION OF ERISA § 404(a)

145.    Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

146.    Defendant SSBT is a named fiduciary for the Plans. It is the Trustee for the Plans, which is a fiduciary role. As such, ERISA § 404 requires SSBT to discharge its fiduciary duties solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. ERISA § 404, 29 U.S.C. § 1104, also requires SSBT to discharge its fiduciary duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

147.     SSBT breached these duties by causing the Plans to incur Improper Out-of-Pocket Markups, which was not solely in the interest of the Plans' participants and beneficiaries, not for the exclusive purpose of providing benefits to Plans' participants and their beneficiaries, and certainly not for the purpose of defraying reasonable expenses of administering the plan. SSBT's conduct also breached its duties of care, skill, prudence and diligence. To the extent SSBT argues that it was unaware of SSGM's SWIFT message fee overbilling scheme, SSBT breached it ERISA fiduciary duties by failing to detect or inquire as to the SWIFT message fee overbilling practices of SSGM, of which SSBT owns a controlling interest and has daily working contacts.

148.     As a consequence of these ERISA violations, the Plans suffered financial losses.

149.     To remedy these violations, Plaintiffs are entitled under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to damages in an amount sufficient to make good to the Plans any losses to the Plans resulting from each such breach, and to restore to the Plans any profits of SSBT which have been made through use of assets of the Plans by SSGM. Plaintiffs are also entitled to such other equitable or remedial relief as the court may deem appropriate.

## COUNT EIGHT:
## SSGA's VIOLATION OF ERISA § 404(a)

150.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

151.     Defendant SSGA is a named fiduciary for the Plans. It is an Investment Manager for the Plans, which is a fiduciary role. As such, ERISA § 404 requires SSGA to discharge its fiduciary duties solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. ERISA § 404, 29 U.S.C. § 1104, also requires SSGA to discharge its fiduciary duties with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

152. SSGA breached these duties by causing the Plans to incur Improper Out-of-Pocket Markups, which was not solely in the interest of the Plans' participants and beneficiaries, not for the exclusive purpose of providing benefits to Plans' participants and their beneficiaries, and certainly not for the purpose of defraying reasonable expenses of administering the plan. SSGA's conduct also breached its duties of care, skill, prudence and diligence. To the extent SSGA argues that it was unaware of SSGM's SWIFT message fee overbilling scheme, SSGA breached it ERISA fiduciary duties by failing to detect or inquire as to the SWIFT message fee overbilling practices of SSGM, which is SSGA's sister corporation and with which it has daily working contacts.

153. As a consequence of these ERISA violations, the Plans suffered financial losses.

154. To remedy these violations, Plaintiffs are entitled under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to damages in an amount sufficient to make good to the Plans any losses to the Plans resulting from each such breach, and to restore to the Plans any profits of SSGA which have been made through use of assets of the Plans by SSGA. Plaintiffs are also entitled to such other equitable or remedial relief as the court may deem appropriate.

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and appointing undersigned counsel as Class Counsel.;

B.     A Declaration that SSGM engaged in prohibited transactions with assets of the Plans; that SSGM breached its ERISA fiduciary duties to the Plaintiffs and the Plans; that SSBT breached its ERISA fiduciary duties to the Plaintiffs and the Plans; that SSGA breached its ERISA fiduciary duties to the Plaintiffs and the Plans; that SSBT is jointly and severally liable with SSGM for its prohibited transactions and breaches of ERISA fiduciary duties; and that SSGA is jointly and severally liable with SSGM for its prohibited transactions and breaches of ERISA fiduciary duties;

C.     An Order compelling Defendants to make good to Plaintiffs and the Plans all losses resulting from Improper Out-of-Pocket Markups and to restore to Plaintiffs and the Plans all profits that the participants and beneficiaries would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of Plaintiffs and the Plans as the ERISA violations alleged herein;

E.     An Order awarding costs to Plaintiffs pursuant to 29 U.S.C. §1132(g);

F.     An Order awarding attorney fees to Plaintiffs pursuant to the common fund doctrine, 29 U.S.C. §1132(g), and other applicable law;

G.      An Order for surcharge, equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

H.      Granting such other and further relief as the Court may deem just and proper.


**Plaintiffs demand jury trial on all issues so triable.**


RESPECTFULLY SUBMITTED this 25th day of March, 2017.

PLAINTIFFS

*/s/ Jonathan M. Feigenbaum*


_____

Jonathan M. Feigenbaum. Esq.
BBO #546686
184 High Street
Boston, Massachusetts 02110
Tel: (617) 357-9700
Email: jonathan@erisattorneys.com

Todd Schneider*
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
Email: tschneider@schneiderwallace.com

Garrett W. Wotkyns*
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Tel: (480) 428-0145
Fax: (866) 505-8036
Email: gwotkyns@schneiderwallace.com

36

Lynn Lincoln Sarko*
T. David Copley*
Laura R. Gerber*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Phone: (206) 623-1900
Facsimile: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: dcopley@kellerrohrback.com
Email: lgerber@kellerrohrback.com

Jeffrey Lewis*
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, California 94612
Tel: (510) 463-3900
Fax: (510) 463-3901
Email: jlewis@kellerrohrback.com

*Attorneys for Plaintiffs*