# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| German Leal, Esperanza Pena, and Wendy Williams on behalf of themselves and the Baxter International Inc. & Subsidiaries Incentive Investment Plan, and all other similarly situated ERISA plan participants and beneficiaries,<br><br>               Plaintiffs,<br><br>v.<br><br>State Street Bank & Trust Co.,<br><br>               Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:17-cv-10512<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I. COMPLAINT ................................................................................................... 1

II. OVERVIEW ................................................................................................... 1

III. JURISDICTION AND VENUE.................................................................... 3

IV. THE PARTIES .............................................................................................. 4

    A. Plaintiffs ............................................................................................ 4

    B. Defendant .......................................................................................... 5

V. DEFENDANT'S FIDUCIARY STATUS .................................................... 5

VI. SUBSTANTIVE ALLEGATIONS ............................................................. 7

VII. THE RELEVANT LAW ............................................................................. 16

VIII. CLASS ACTION ALLEGATIONS ........................................................... 18

IX. CLAIMS FOR RELIEF............................................................................... 21

## I.   COMPLAINT

Plaintiffs German Leal, Esperanza Pena, and Wendy Williams ("Plaintiffs"), bring this class action on behalf of the Baxter International Inc. & Subsidiaries Incentive Investment Plan (the "Plan") and on behalf of all other similarly-situated ERISA plan participants and beneficiaries ("the Plans"), that suffered losses as a result of the breaches of fiduciary duties by Defendant State Street Bank & Trust Company ("State Street," "SSBT" or "Defendant") described herein. Plaintiffs bring this action by and through their undersigned attorneys based upon personal knowledge and information obtained through investigation by their counsel. Plaintiffs expect that reasonable opportunity for discovery will uncover additional substantial support for the allegations in this Amended Class Action Complaint ("Complaint").

## II.   OVERVIEW

1.     This Complaint concerns violations of the Employee Retirement Income and Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, that Defendant committed in its roles as fiduciary for the Plans including by designation as investment service provider, investment manager, investment custodian, investment trustee and investment record keeper to Plaintiffs and the Plans, and as functional fiduciary for the Plaintiffs and the Plans. Plaintiffs Leal, Pena, and Williams are participants in the Plan, a defined contribution plan.  In violation of its fiduciary duties and ERISA's prohibited transaction rules, Defendant systematically overcharged retirement investors such as Plaintiffs and the Plans for "expenses" including but not limited to so-called SWIFT messaging services (hereafter, "Improper Out-of-Pocket Charges").  As a result of this practice, Plaintiffs and the Plans suffered losses in the form of reductions of the amounts in their Plan accounts. Plaintiffs and the Plans seek to redress losses to the Plans, obtain class-wide injunctive relief, and secure disgorgement of unjust profits, pursuant to ERISA §§409 and 502(a)(2) and (3), 29 U.S.C. §§1109 and 1132(a)(2) and (3).

2.      As explained further below, Defendant shamelessly price-gouged retirement plans and other clients by charging clients Improper Out-of-Pocket Charges that in some cases it should not have charged at all, and that in other cases were far in excess of the actual cost of providing those services.  Defendant did this notwithstanding that at all material times it was serving as an ERISA fiduciary to the Plans.  In fact, for almost two decades these Improper Out-of-Pocket Charges were a secret and lucrative profit center for Defendant.  This continued until the Commonwealth of Massachusetts investigated State Street's Improper Out-of-Pocket Charges.  That investigation resulted in the Massachusetts Attorney General filing a securities enforcement complaint against State Street Global Markets LLC concerning one or more of the Improper Out-of-Pocket Charges.  (*See* https://www.bostonglobe.com/business/2016/04/20/state-street-hit-galvin-for-overbilling-clients/8j3n0XMwUOLddJQcijtMRK/story.html (last viewed March 20, 2017).)

3.      Defendant's imprudent, disloyal, and conflicted decisions resulted in Plaintiffs and the Plans paying excessive amounts for the Improper Out-of-Pocket Charges, losing investment returns on the amounts wrongfully paid, and substantially diminishing the retirement savings of the Plans' participants and beneficiaries.

4.      In December 2015, Defendant announced that it was undertaking a review of its invoicing practices concerning certain expenses invoiced to clients during an 18-year period going back to 1998. In its most recent 10K filing, State Street Corp. (Defendant SSBT's parent corporation) stated that it expects to pay at least $340 million (including interest), in connection with that review.  However, as explained more fully below, State Street's determination of what it will pay and what it will not pay to reimburse the Plans for its Improper Out-of-Pocket Charges is flawed and will not result in full reimbursement of losses to Plaintiffs and the Plans.

5.       Defendant's Improper Out-of-Pocket Charges violated provisions of ERISA § 406 that prohibit fiduciaries from causing retirement plans to engage in transactions with related parties and from engaging in self-dealing transactions. By using the Plans' retirement plan assets for the benefit of itself and its affiliates, and by collecting unreasonable fees and other compensation in connection with imposition of the Improper Out-of-Pocket Charges and placing its own interests ahead of those of the participants and the Plans, Defendant engaged in multiple prohibited transactions, which are *per se* unlawful and not exempt under any individual, class, or statutory exemption.

6.       Defendant also breached its fiduciary duties under ERISA § 404(a) by using the Plans' assets imprudently and acting in its self-interest, thereby causing losses to the Plans.

7.       Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf themselves and all other similarly-situated persons who are participants or beneficiaries in Plans that were subject to Improper Out-of-Pocket Charges, seeking recovery on behalf of those Plans under ERISA's specific remedial provisions.

8.       Defendant has sole possession of much of the relevant information and documents concerning Plaintiffs' allegations. Following discovery, Plaintiffs will, to the extent necessary and appropriate, seek leave to amend this Complaint to add additional facts that further support Plaintiffs' claims.

### III.       JURISDICTION AND VENUE

9.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), codified at 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

10.       This Court has personal jurisdiction over Defendant because ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

11.     In addition, this Court has general and specific personal jurisdiction over Defendant because it is organized and has its principal place of business within this District, and because it engaged in the conduct described herein within this district.

12.     Venue is proper in this district pursuant to ERISA § 502(e)(2), codified at 29 U.S.C. § 1132(e)(2), because Defendant resides in or may be found in this district and/or the alleged breaches of the duties imposed by ERISA took place in this district.

## IV.     THE PARTIES

**A.     Plaintiffs**

13.     **German Leal ("Leal")** is a participant in the Baxter International Inc. & Subsidiaries Incentive Investment Plan ("Baxter Plan").  Leal resides in Palmetto Bay, Florida. Leal has directed the investment of Plan assets in his account into a number of investment options offered by the Baxter Plan, including the Target Retirement 2045, the Target Retirement 2050, the S&P 500 Equity Index Fund, the Emerging Markets Equity Fund, and the Mid Cap Equity Index Fund, funds that, upon information and belief, were subject to the excessive charges imposed by Defendant for the Improper Out-of-Pocket Charges. The Baxter Plan currently has over 13,000 active participants and about $2,149,700,000 in plan assets.

14.     **Esperanza Pena ("Pena")** is a participant in the Baxter Plan.  Pena resides in Palmetto Bay, Florida.  Pena has directed the investment of Plan assets in her account into a number of investment options offered by the Baxter Plan, including the Stable Income Fund, the Mid Cap Equity Index Fund, the S&P 500 Equity Index Fund, the International EAFE Equity Index Fund, the Small Cap Fund, the Target Retirement 2030 Fund, the Baxter Common Stock Fund, the Baxalta Common Stock Fund, the General Equity Fund, and the Composite Fund, funds that, upon information and belief, were subject to the excessive charges imposed by Defendant through the Improper Out-of-Pocket Charges.

4

15.     **Wendy Williams ("Williams")** is a participant in the Baxter Plan. Williams resides in Germantown, Tennessee. Williams has directed the investment of Baxter Plan assets in her account into a number of investment options offered by the Baxter Plan, including the Mid Cap Equity Index Fund, the S&P 500 Equity Index Fund, the International EAFE Equity Index Fund, the Small Cap Fund, the Target Retirement 2030, 2035, 2040, 2045 and 2050 Funds, and the Baxter Common Stock Fund, funds that, upon information and belief, were subject to excessive charges imposed by Defendant through the Improper Out-of-Pocket Charges.

**B.     Defendant**

16.     State Street Bank & Trust Company, SSBT, is a Massachusetts trust company with its principal place of business in Quincy, Massachusetts. SSBT has performed and received payment for services it has provided for the Plans—including trustee services, custodial services and investment management services.

17.     SSBT provides custodial services to institutional investors including the Plans and many investment funds and trusts that hold the Plans' assets through its Global Services Americas ("GSA") division including GSA's United States Investor Services ("USIS") division, GSA's Institutional Investors Services ("IIS") division, and GSA's Alternative Investor Services ("AIS") division. State Street also provides services through a number of other operating divisions, including State Street Global Advisors ("SSGA") and State Street Global Markets ("SSGM").

## V.     DEFENDANT'S FIDUCIARY STATUS

18.     ERISA imposes fiduciary duties on persons explicitly named as fiduciaries. ERISA § 402(a), 29 U.S.C. § 1102(a).

19.     ERISA also imposes fiduciary duties on any other persons who in fact perform fiduciary functions—these are referred to as "functional fiduciaries." Thus, a person is a fiduciary *to the extent* "(i) he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

20.     SSBT is a functional fiduciary under ERISA § 3(21) with respect to the Plans because it exercised authority or control respecting management or disposition of the assets of the Plans and/or it had and used discretion to determine its own compensation in the form of Improper Out-of-Pocket Charges. As explained in further detail below, SSBT was allowed to incur certain necessary expenses for the Plans and to pass those expenses along to the Plans, but it abused that discretionary power by, *inter alia*, (1) charging for certain categories of expenses that it was not allowed to pass along to the Plans; and (2) marking up other categories of expenses.  By those actions, SSBT reaped hundreds of millions of dollars in illicit profits. SSBT unilaterally set its compensation for these pass-through charges. When a party has discretion to determine what ERISA participants and plans pay to it, the party setting its own compensation becomes a functional fiduciary as to the exercise of that discretion.

21.     State Street's Improper Out-of-Pocket Charges constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the Plans within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and 29 C.F.R. § 2510.3-101(a). This is particularly so because State Street exercised discretion in deciding what items it would charge for, choosing when and how to execute the Improper Out-of-Pocket Charges, deciding the amount of those Charges, and pocketing the Improper Out-of-Pocket Charges for itself.

22.     SSBT also has served as custodian, trustee, investment advisor and/or investment management for each of the Plans during at least part of the Class Period, and in those capacities was an express (or 'named') fiduciary for the Plans as well as.

23.     In its role as fiduciary for the Plans, SSBT, through its employees and agents, assessed the Improper Out-of-Pocket Charges to Plaintiffs and the Plans.

## VI.     SUBSTANTIVE ALLEGATIONS

24.     As detailed in an April 20, 2016, Administrative Complaint filed by the Commonwealth of Massachusetts, and as revealed in State Street's recent disclosures, described below, over an 18-year period, Defendant, through the concealed Improper Out-of-Pocket Charges, earned hundreds of millions of dollars in additional revenue at the expense of investors such as the Plans and Plaintiffs here.

25.     As a result of these revelations and the government enforcement action, Defendant announced a plan to review its billing practices and issue partial refunds to clients who were overcharged the Improper Out-of-Pocket Charges. *See* State Street Bank and Trust, *Summary of Methodology and Payment Determination dated May 2016, updated as of April 11, 2017* ("Methodology and Payment Summary"). Defendant developed this methodology in consultation with a consulting firm known as Floyd Advisory, which is "not a CPA firm and do[es] not provide attest services, audits or other engagements in accordance with the AICPA Statements on Auditing Standards." *See* Floyd Advisory, *Report to State Street Bank and Trust Company Re: Expense Billing Review and Payment Determination* (April 11, 2017) at 2 n.1 ("Floyd Report").

26.     The Methodology and Payment Summary and Floyd Report reveal that Defendant's Improper Out-of-Pocket Charges included not only the SWIFT messaging charges that are the subject of the Massachusetts Attorney General's action (as described in Plaintiffs' original

7

Complaint in this matter), but also *twelve* other categories of systematic overcharges or improper charges. Defendant describes the thirteen categories as:

1.  SWIFT messaging;

2.  SEC Rule 17f-5 reports;

3.  Archiving;

4.  Checks and check-writing privileges;

5.  Delivery and courier services;

6.  Duplication and printing;

7.  Forms and supplies;

8.  Micro equipment and support equipment;

9.  Asset pricing and valuation;

10.  SAS 99 data feeds;

11.  SOC-1 reports;

12.  Telephone services; and

13.  Wires.

27.     Defendant did not disclose the Improper Out-of-Pocket Charges to the Plans until after December of 2015, but instead engaged in a long-running course of concealment from Plaintiffs and the Plans of the Improper Out-of-Pocket Charges by falsifying billing statements to make it appear that the Improper Out-of-Pocket Charges were simply pass through charges permitted by the Plans' custody fee agreements.

28.     Each of the thirteen categories of Improper Out-of-Pocket Charges was, in whole or in part, not allowed pursuant to the explicit terms of State Street's agreements with the Plans and/or the custom and practice in the industry.

29.     On December 17, 2015, Defendant announced in a press release titled "State Street Notifies Asset Servicing Clients about Billing Review" (the "December 17th Press Release"), "that it [was] informing clients about a review that it initiated into the manner in which it invoiced certain expenses to asset servicing clients."

30.     The December 17th Press Release further stated, "[b]ased upon the Company's preliminary assessment, over the 18-year period for which it has accessible records, approximately $200 million or more of expenses may have been incorrectly invoiced."

31.     More recently, State Street Corporation's 2016 annual report published on February 16, 2017, states that Defendant has identified approximately $340 million (including interest) as the amount "we currently expect to pay . . . in connection with that [invoicing] review."

32.     Defendant's reimbursement plan does not fully compensate all class members for the Improper Out-of-Pocket Charges in several regards, including but not necessarily limited to the following: (a) it continues to treat some categories of charges as proper despite the fact that they are not proper; (b) it continues to treat some parts of some categories of charges as proper despite the fact that they are not proper; (c) it is the product of Defendant's own analysis and Defendant's hand-picked consultant, rather than the product of an independent fiduciary or other objective third party; (d) it improperly offsets what Defendant claims were undercharges for certain expenses against its admitted overcharges; and (e) it applies an interest rate unilaterally selected by Defendant in calculating interest owed on improper charges.

33.     The enforcement actions and the details of State Street's history of overcharging for SWIFT messaging illustrate why Plaintiffs and the Class cannot rely on State Street's determination of the amounts it owes to the Plans.

34.     Of the categories of Improper Out-of-Pocket Charges, most publicly available information relates to the SWIFT messages.

35.     Society for Worldwide Interbank Financial Telecommunication (hereinafter "SWIFT") messages are secure electronic messages used to effectuate securities trades and related financial transactions, including payments.[1]  Defendant systematically overcharged the Plans for transmission of SWIFT messages.

36.     While SWIFT message-related expenses were labeled as out-of-pocket expenses and charged as such to the Plans, in reality these expenses were marked up by Defendant by a factor of up to 20 times the actual amount of money it cost Defendant to send SWIFT messages.

37.     Defendant's SWIFT message expenses included two components: (1) unit charges and (2) Defendant's SWIFT message fee ("SWIFT message fee").

38.     The unit charge represented the per SWIFT message expense charged by SWIFT to Defendant.

39.     The standard SWIFT message fee of $5.00 purportedly included Defendant's overhead expense associated with sending SWIFT messages. For example, the cost of SWIFT terminals, maintenance of files to SWIFT and all other overhead costs incurred by Defendant to ensure proper transmission of the SWIFT messages.

40.     While the unit charge associated with SWIFT messaging decreased over time, the standard SWIFT message fee charged by Defendant remained $5.00.

41.     Defendant has long known that the SWIFT message fees being charged to their clients were disproportionate to the actual costs for these services and that Defendant's billing

---

[1] *See* http://www.investopedia.com/articles/personal-finance/050515/how-swift-system-works.asp (last viewed March 20, 2017).

practices were part and parcel of an intention by Defendant to make outsize profits on out of pocket and fee-based services offered to clients.

42.     On July 29, 2002, a consulting firm presented findings to Defendant including a report titled "Capturing Value From Billed-Versus-Contracted Discrepancies" (hereinafter "Fee Report").

43.     The Fee Report identified an opportunity for Defendant to recover a total of $9-13 million revenue related to so-called Out-of-Pocket and fee-based expenses by "more aggressive data capture and billing practices."

44.     On information and belief, and as set forth in the Administrative Complaint, discovery will reveal Defendant's long-running knowledge of the price-gouging scheme related to Improper Out-of-Pocket Charges on SWIFT messages.

45.     Beginning in at least 2004 and continuing through 2015, Defendant's employees recognized that the SWIFT message fee was not merely a "pass through charge" and that it created exposure for Defendant's operations.

46.     In a November 1, 2004, email, Defendant's employees internally discussed the SWIFT message fee via email, with one of Defendant's employees stating that "[f]or those clients that are billing back to their client, most clients are billing $5 per message.  The true cost is about $2 per message."

47.     On December 12, 2005, in an email response with the subject line "[REDACTED] SWIFT Recovery" a State Street employee wrote:

> Really I think the only true decision to be made is whether or not we are going to charge the standard ("grossed up") charge or a modified one. The client I had referenced in our phone conversation was . . . already at a non-standard charge of $3.50 as opposed to the standard charge of $5. There is some analysis currently going on around this and I have been told unofficially that the true "cost" is around $1.

48.     On December 14, 2005, Defendant's employees questioned whether the SWIFT message fee being charged was actually "out-of-pocket," when they wrote, "[h]ow do we get our arms around what is a realistic number.  If it's costing us $1 and we are charging $5 my concern is that is no longer an out-of-pocket."

49.     Defendant's employees were also concerned with the tremendous exposure created by Defendant's concealed out-of-pocket expense charges.  One of Defendant's employees noted in an email sent on October 24, 2006, that "[t]his could be another 'repo' type issue where if the client ever asked for the detail of the charges we could have egg on our face."

50.     When discussing one large institutional client, one of Defendant's employees stated, "[w]e can't be in a position . . . that they discover that we are taking them to the cleaners on SWIFT charges."

51.     In 2007, one of Defendant's employees commented:

> Sometime back at the beginning of time there was some form of analysis that arrived at the $5 per message (my guess / understanding is that there was overhead included in this figure at the time that now should be spread over a much larger universe). Today that figure is grossly inaccurate in terms of actual cost or even any legitimately defendable 'fully loaded cost'.  I would absolutely not charge this rate to any new clients.

52.     In March 2009, Defendant's employees once again questioned the reasonableness of Defendant's SWIFT message fee via email, with another of Defendant's employees stating "I believe we are charging some absurd fee per message (about $5)."

53.     And yet another of Defendant's employees reiterated this sentiment in an email two days later, stating, "The $5 SWIFT message fee is billed as an out of pocket which by definition should be a pass through charge at cost."

54.     On April 1, 2009, when discussing the true cost of SWIFT messaging assessed by Defendant, one of Defendant's employees stated, "I think it is 25 cents to be honest with you."

55.     On April 2, 2009, one of Defendant's employees stated that the SWIFT message fee was a big problem for Defendant.  According to the email: "Out of pocket" with "mark up" = ["]Big Problem."

56.     The same day, Defendant's employees further emailed:

The fact [REDACTED] can't provide us what we pay SWIFT per message means there is some serious monkey business going on here.  It will be interesting to see what he comes back with. I was told by [REDACTED] what we bill = Per message fee paid to SWIFT + overhead + programming fees. That is a bunch [of] crap.

57.     In a separate email exchange on April 6, 2009, yet another of Defendant's employees also questioned Defendant's SWIFT message fee. When asked whether a senior employee of Defendant thought that Defendant was charging too much in relation to SWIFT messages, the senior Defendant's employee responded:

No issues from me. As far as I am concerned it's been $5.00 for many years on many clients and I have no intention to change it. I believe that Managers need an education on out of pockets as many of them do not understand how the bank arrives at some of the numbers here.  They should be straight pass thru but as well [sic] all know this place does tack on additional expenses and marks them up to cover all internal costs.

58.     On April 12, 2009, one of Defendant's employees requested information regarding the SWIFT message fee, to present to one of Defendant's executives, stating, "I want to lay this out to [Defendant's executive], this is some big $."

59.     On April 13, 2009, another of Defendant's employees responded, summarizing:

1. The fee we pay SWIFT is .12 per SMAC unit message and .05 per MCH unit message. There is an initiative underway to move these fees to .09 and .04 for SMAC and MCH respectively.

2. The $5 fee represents coverage of the indirect charges for SWIFT messages. This includes the cost of SWIFT terminals, maintenance of files to SWIFT and all other overhead costs incurred in State Street to ensure proper transmission of the SWIFT messages. According to research undertaken by [REDACTED] over the past week he estimates the true cost of these indirect charges as about .25. A $4.50 markup per message results.

3. [REDACTED] stated he knows exactly the revenue generated from these SWIFT message fees across [REDACTED]'s area. However, he would not disclose this figure to me other [sic] to say it is significant. He said that if you or [REDACTED] want this detail he would be willing to share. Just from what we have seen in our group the annual revenue from this markup must be in the tens $ of millions.

60.     Later, in 2009, another of Defendant's employees emailed, stating, "[t]his is getting messy.  We are charging the fund a huge mark-up to send SWIFT messages to a service provider who will know exactly what the messages cost."

61.     Also in 2009, when asked by one of Defendant's employees what to tell a client regarding SWIFT messages, another of Defendant's employees responded, "keep information sharing at a minimum on this."

62.     Again, in 2009, one of Defendant's employees commented, "[w]hy we are marking up SWIFT charges is beyond me.  I understand OOP's [out-of-pockets] as pass through charges." Only hours later, that same employee emailed, "I'm telling you. I learn something every day. Simply not amazed at anything that goes on here anymore."

63.     While the true cost for SWIFT messages decreased from 2005 to 2009, the standard SWIFT message fee passed through to Defendant's clients, including the Plans, remained consistent.

64.     Approximately one year later, in February 2010, when asked via email about seeking the SWIFT message fees generated from the liquidation of a client fund, one of Defendant's employees stated that "[t]here is a huge markup with SWIFT charges and I don't want her asking for detail and then the secret will be out there."

65.     In an email on July 15, 2010, one of Defendant's employees summarized, "[REDACTED] does not want to pay the $5 per message.  He thinks that is a huge injustice because he knows how little the message costs."

66.     In November 2010, while one of Defendant's employees stated the $5.00 SWIFT message fee covered State Street's overhead, another of Defendant's employees with knowledge of the actual cost of a SWIFT message, incredulously responded in an email, "$4.96 to cover [overhead]? Is she serious??!!"

67.     Further, certain of Defendant's executives knew of Defendant's mark-ups on out-of-pocket expenses.  According to an internal document sent via email to an executive, one of Defendant's employees stated, "I would think that our clients would think that OOP expenses are pass thru's with maybe a bit of mark-up to cover our expenses. . . . We charge our clients $5.00 per message—an exorbitant markup that will certainly piss off clients when they figure this out."

68.     In an email response regarding the document, the same executive stated, "I would delete the section on OOP expenses.  I would do more work on your own and maybe raise as a strategy question with a small group verbally only."

69.     One of Defendant's clients, an investment manager, raised multiple concerns to Defendant regarding out-of-pocket expenses and SWIFT message charges, beginning in 2010. Defendant's only response was that out-of-pocket expenses were "pass through charges."

70.     In 2014, the investment manager again raised concerns to Defendant regarding high out-of-pocket expenses, noting an unexpected and substantial charge for SWIFT messages. Finally, in 2015, while meeting with other custodial firms, the investment manager learned that at least one other custodial firm charged, at most, $0.25 for SWIFT messages.  For at least some of the investment manager's funds, out-of-pocket expenses were borne by investors.  Defendant advised that they would look into the issue, and ultimately agreed to reimburse the investment manager for the overcharged SWIFT message fees dating back to 2009.

71.     On top of its overcharges for SWIFT messaging, Defendant received rebates from SWIFT, which operated as a not-for-profit entity and rebated excess revenues to participating organizations.  Defendant did not share these rebates with the Plans. According to a 2012 email, Defendant received one or more rebates from SWIFT of approximately $1.5 million over an undisclosed time period.

72.     On information and belief, State Street engaged in comparable misconduct with respect to the other categories of Improper Out-of-Pocket Charges: SEC Rule 17f-5 reports; Archiving; Checks and check-writing privileges; Delivery and courier services; Duplication and printing; Forms and supplies; Micro equipment and support equipment; Asset pricing and valuation; SAS 99 data feeds; SOC-1 reports; Telephone services; and Wires.

## VII.    THE RELEVANT LAW

73.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in relevant part, that a civil action for breach of fiduciary duty may be brought by a participant of a plan for relief under ERISA § 409, 29 U.S.C. § 1109.

74.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

75.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes participants in ERISA plans to seek appropriate equitable relief from Defendant, including, without limitation, injunctive relief, surcharge, a constructive trust, and restitution.

76.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide in relevant part, that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

77.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).

78.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries [when] deciding . . . which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable . . . .

DOL Ad. Op. 97-15A; DOL Ad. Op. 97-16A.

79.     As set forth herein, Defendant failed in the discharge of these duties, and, generally, in its duty to manage the assets of the Plans prudently, loyally, and in the best interests of the Plans and the Class.

80.     ERISA § 406 also prohibits certain transactions with a plan involving parties in interest and fiduciaries because of their high potential for abuse. Essentially, §§ 406(a)(1)(C) and (D) of ERISA prohibit a fiduciary with respect to a plan from causing the plan to engage in a transaction, if he or she knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest, or transfer to,

or use by or for the benefit of, a party in interest, of any assets of the plan. Section 406(b)(1) of ERISA further prohibits a fiduciary with respect to a plan from dealing with the assets of the plan in his or her own interest or for his or her own account. In this case, SSBT used its discretionary authority as a fiduciary to execute transactions through SSGM, its affiliated broker; a transaction that violates ERISA §§ 406(a)(1)(C) and (D) and 406(b)(1).

81.     Section 408(b)(2) of ERISA exempts from the prohibitions of § 406(a) any contract or reasonable arrangement with a party in interest, including a fiduciary, for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor. Further, § 408(c)(2) of ERISA provides, in relevant part, that nothing in § 406 shall be construed to prohibit any fiduciary from receiving compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his or her duties with respect to the plan.

82.     ERISA does not contain an exemption for the prohibitions against self-dealing described in § 406(b) even if such act occurs in connection with a provision of services which is exempt under § 408(b)(2).

83.     Notwithstanding the foregoing allegations that various prohibited transaction exemptions are not available to Defendant, a claim that an alleged prohibited transaction is subject to an exemption is an affirmative defense as to which the defendant bears the burden of proof.

## VIII.   CLASS ACTION ALLEGATIONS

84.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of persons similarly situated (the "Class"):

> Participants and beneficiaries of ERISA Plans that were charged Improper Out-of-Pocket Charges by the Defendant, at any time between January 1, 1998 and the present (the "Class Period").

85.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, upon information and belief, hundreds of ERISA-covered retirement plans throughout the country invested their participants' retirement savings with Defendant and used Defendant as an investment service provider, investment manager, investment custodian, investment trustee and/or investment record keeper as Plaintiffs and the Plan did here during the Class Period, and sustained losses as a result of the Improper Out-of-Pocket Charges.

86.     **Commonality**. The claims of Plaintiffs and all Class members originate from the same misconduct, and breaches of ERISA's fiduciary duties by the Defendant.

87.     Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

(a)     Whether Defendant is or was a fiduciary under ERISA;

(b)     Whether Defendant breached its fiduciary duties under ERISA;

(c)     Whether Defendant failed to provide complete and accurate information to Plans and their participants and beneficiaries when Defendant imposed Improper Out-of-Pocket Charges;

(d)     Whether Defendant's acts caused losses to the Plans and, if so, the appropriate relief to which the Plans, are entitled;

(e)     Whether Defendant imposed Improper Out-of-Pocket Charges, directly or indirectly, in connection with transactions involving Plan assets, and whether such compensation was reasonable;

(f)     Whether Defendant breached its duties in charging Improper Out-of-Pocket Charges; and

(g)     Whether Defendant caused the Plans to engage in prohibited transactions with parties in interest and fiduciaries, including Defendant and its affiliates.

88.     **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, Plaintiffs' claims on behalf of the Plans are not only typical of, but identical to, any claims under this section brought by any Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

89.     **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

90.     **Rule 23(b)(1)(A) & (B) Requirements**. Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status also is warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

91.     **Rule 23(b)(2) Requirements**. Certification under Rule 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

92.     **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## IX.     CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF ERISA § 406(a)

93.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

94.     At all relevant times, Defendant SSBT has been a named and functional fiduciary of the Plans.

95.     As such, it has been prohibited from engaging in conduct proscribed by ERISA § 406(a), 29 U.S.C. § 1106(a).

96.     SSBT violated ERISA § 406(a)(1)(C) by causing the Plans to incur Improper Out-of-Pocket Charges that constituted direct or indirect furnishing of goods, services, or facilities between the Plans and SSBT.

97.     SSBT violated ERISA § 406(a)(1)(D) by causing the Plans to incur Improper Out-of-Pocket Charges that constituted direct or indirect transfer to, or use by or for the benefit of SSBT of assets of the Plans.

98.     SSBT knew or should have known that it was causing the Plans to engage in the transactions discussed above.

99.     As a consequence of these ERISA violations, the Plans suffered financial losses.

100.    To remedy these violations, Plaintiffs are entitled under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 & 1132(a)(2), to damages in an amount sufficient to make good to the Plans any losses to the Plans resulting from each such breach, and to restore to the Plans any profits of SSBT which have been made through use of assets of the Plans by SSBT. Plaintiffs are also entitled to appropriate equitable and/or injunctive relief under ERISA §§ 409 and 502(a)(3), 29 U.S.C. §§ 1109 and 1132(a)(3).

## COUNT TWO:
## VIOLATION OF ERISA § 406(b)

101.    Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

102.    At all relevant times, Defendant SSBT has been a named and functional fiduciary of the Plans.

103.    As such, it is prohibited from engaging in conduct proscribed by ERISA § 406(b), 29 U.S.C. § 1106(b).

104.    SSBT violated ERISA § 406(b)(1) by dealing with the assets of the Plans in its own interest or for its own account.

105.    As a consequence of these ERISA violations, the Plans suffered financial losses.

106.    To remedy these violations, Plaintiffs are entitled under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 & 1132(a)(2), to damages in an amount sufficient to make good to the Plans any losses to the Plans resulting from each such breach, and to restore to the Plans any profits of SSBT which have been made through use of assets of the Plans by SSBT. Plaintiffs are

also entitled to appropriate equitable and/or injunctive relief under ERISA §§ 409 and 502(a)(3), 29 U.S.C. §§ 1109 and 1132(a)(3).

**COUNT THREE:**
**VIOLATION OF ERISA § 404(a)**

107.     Plaintiffs reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

108.     At all relevant times, Defendant SSBT has been a named and functional fiduciary of the Plans.

109.     As such, ERISA § 404 requires SSBT to discharge its fiduciary duties solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. ERISA § 404, 29 U.S.C. § 1104, also requires SSBT to discharge its fiduciary duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

110.     SSBT breached these duties by causing the Plans to incur Improper Out-of-Pocket Charges, which was not solely in the interest of the Plans' participants and beneficiaries, not for the exclusive purpose of providing benefits to the Plans' participants and their beneficiaries, and certainly not for the purpose of defraying reasonable expenses of administering the plan. SSBT's conduct also breached its duties of care, skill, prudence and diligence.

111.     As a consequence of these ERISA violations, the Plans suffered financial losses.

112.     To remedy these violations, Plaintiffs are entitled under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 & 1132(a)(2), to damages in an amount sufficient to make good to the Plans any losses to the Plans resulting from each such breach, and to restore to the Plans any

profits of SSBT which have been made through use of assets of the Plans by SSBT. Plaintiffs are also entitled to appropriate equitable and/or injunctive relief under ERISA §§ 409 and 502(a)(3), 29 U.S.C. §§ 1109 and 1132(a)(3).

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and appointing undersigned counsel as Class Counsel;

B.     A Declaration that SSBT caused and engaged in prohibited transactions with regard to the Plans and that SSBT breached its ERISA fiduciary duties to the Plaintiffs and the Plans;

C.     An Order compelling SSBT to make good to the Plans all losses resulting from Improper Out-of-Pocket Charges and to restore to the Plans all profits that it made by use of such funds;

D.     Imposition of a constructive trust on any amounts by which SSBT was unjustly enriched at the expense of Plaintiffs and the Plans by reason of the ERISA violations alleged herein;

E.     An Order awarding costs to Plaintiffs pursuant to 29 U.S.C. § 1132(g);

F.     An Order awarding attorneys' fees to Plaintiffs pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and/or other applicable law;

G.     An Order for surcharge, equitable restitution, and other appropriate equitable and injunctive relief; and

H.     Such other and further relief as the Court may deem just and proper.

Plaintiffs demand jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 28th day of August, 2017.

By: *s/ T. David Copley*
T. David Copley, *pro hac vice*
Lynn Lincoln Sarko, *pro hac vice forthcoming*
Laura R. Gerber, *pro hac vice*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Phone: (206) 623-1900
Facsimile: (206) 623-3384
Email: dcopley@kellerrohrback.com
Email: lsarko@kellerrohrback.com
Email: lgerber@kellerrohrback.com

Jeffrey Lewis, *pro hac vice*
**KELLER ROHRBACK L.L.P.**
300 Lakeside Drive, Suite 1000
Oakland, California 94612
Phone: (510) 463-3900
Facsimile: (510) 463-3901
Email: jlewis@kellerrohrback.com

Todd Schneider, *pro hac vice forthcoming*
James A. Bloom, *pro hac vice*
John J. Nestico, *pro hac vice pending*
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Phone: (415) 421-7100
Facsimile: (415) 421-7105
Email: tschneider@schneiderwallace.com
Email: jbloom@schneiderwallace.com
Email: jnestico@schneiderwallace.com

Garrett W. Wotkyns, *pro hac vice pending*
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Phone: (480) 428-0145
Facsimile: (866) 505-8036
Email: gwotkyns@schneiderwallace.com

**JONATHAN M. FEIGENBAUM**
184 High Street, Suite 503
Boston, Massachusetts 02110
Phone: (617) 357-9700
Email: jonathan@erisattorneys.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, T. David Copley, hereby certify that on August 28, 2017, I caused a copy of this Amended Class Action Complaint to be served on all registered counsel electronically via the Court's ECF system.

By: <u>*s/ T. David Copley*</u>
T. David Copley, *pro hac vice*